5-3341                                    382 S. W. 2d 892

Opinion Delivered October 19, 1964.

*Eugene S. Harris* and *Bridges, Young & Matthews,* for appellant.

*McMath, Leatherman, Woods & Youngdahl,* for appellee.

GEORGE ROSE SMITH, J. This is a claim filed by the appellees, the widow and children of Orvis Noel Rogers, for death benefits under the workmen's compensation law. The Commission denied the claim upon the ground that the case falls within the "going and coming rule," which exempts the employer from liability for an injury that occurs while the employee is traveling to or from his place of work. The circuit court reversed the Commission's decision, holding that the decedent's transportation was being furnished by his employer, so that the case comes within a recognized exception to the exclusionary rule. The single question is whether the Commission's decision is supported by any substantial evidence.

Rogers, a tractor driver, was one of a seven-man crew employed by McCollum in logging operations. Jim Garlington was the foreman of the crew. For a month or two before Rogers' death Garlington had been picking

up Rogers and two other members of the crew and taking them to and from work daily in his pick-up truck. Two other men in the crew provided their own transportation. The remaining two were truck drivers who drove their employer's trucks to and from work.

Rogers lived about a mile from Highway 167. It was his practice to drive his own car to the highway in the morning in time to meet Garlington at about 6:30. Rogers would leave his car by the highway and ride with Garlington to the logging site, a distance of nine miles or more. It was understood that if Garlington did not appear by 7:00 a.m. it meant that the crew would not work that day.

On the morning of Rogers' death the weather was bitterly cold, a few degrees above zero. Garlington decided that it was too cold to work in the woods and therefore made no attempt to pick up his passengers. There is evidence that Rogers drove to the highway as usual and kept his engine running and his heater operating while he waited. Apparently Rogers started to go back home when Garlington did not show up within the agreed time. At about 8:15 a mail carrier discovered Rogers' car stopped on the road at a point more than halfway along the return route to his home. The position of the car indicated that Rogers may have attempted to park on the righthand side of the road. The engine was still running, and Rogers' lifeless body was slumped over in the driver's seat. The cause of death was carbon monoxide poisoning. Mrs. Rogers testified that there was something wrong with the muffler on the car, but her husband had not indicated that the condition was dangerous.

Counsel for the appellees contend that Garlington was acting for his employer in driving Rogers to and from work. From this premise it is argued that Rogers was also in the course of his employment while waiting in his own car beside the highway and that the onset of his asphyxiation must have taken place before he started to return to his home. We find it unnecessary to test this chain of reasoning, for there is substantial evidence to

support the Commission's finding that Rogers' transportation was not being furnished by his employer.

The governing rule of law was applied in *Cerrato* v. *McGeorge Contracting Co.*, 206 Ark. 1045, 178 S. W. 2d 247, and *O'Meara* v. *Beasley*, 215 Ark. 665, 221 S. W. 2d 282. In both those cases the injury occurred while fellow employees were riding together, but the Commission found that the transportation was not being provided by the employer. In view of that fact we upheld the Commission's denial of compensation. On the other hand, in the cases principally relied upon by the appellees, *Hunter* v. *Summerville*, 205 Ark. 463, 169 S. W. 2d 579, and *Blankinship Logging Co.* v. *Brown*, 212 Ark. 871, 208 S. W. 2d 778, the Commission awarded compensation upon a finding that the employees' transportation was being furnished by the employer. We affirmed that finding. Thus there is no essential conflict in our decisions.

In the case at hand there is sufficient proof to support the Commission's conclusion that this particular arrangement was a matter between fellow employees, not imputable to their employer. Garlington unquestionably owned the pick-up truck that he used in going to and from work. There is no proof that McCollum contributed anything to the expense of its operation. In fact, it does not appear that Garlington's conduct in giving a ride to some of his crew involved any additional expense to himself, for he did not have to go out of his way to pick them up. McCollum, the employer, stated that he paid no part of Rogers' transportation expense. He did not care whether Rogers traveled to the highway in his own car, or walked, or rode with a neighbor. "He was just supposed to bring himself to work." The fact that two other members of this same crew provided their own transportation is contrary to the inference that the contract of employment contemplated transportation by the employer.

We do not discuss the various inferences and arguments that are relied upon by the appellees. These are matters that addressed themselves to the Commission.

It is our duty to view the evidence in the light most favorable to that tribunal's findings. To affirm the circuit court's decision we should have to declare as a matter of law that fair-minded men could reach no conclusion except that the arrangement between Garlington and Rogers was actually chargeable to McCollum. Such an extreme position is not dictated by our prior decisions, liberal though they have been in this particular field. The Commission was free to conclude that Garlington voluntarily used his own vehicle to carry some of his crew to work at his own expense, with no prearrangement or participation on the part of McCollum. We are not permitted to set aside the Commission's decision upon a disputed question of fact.

Reversed.

Harris, C.J., not participating. McFaddin, J., concurs. Johnson, J., dissents.

Jim Johnson, Associate Justice, (dissenting). I do not agree with the majority opinion. I would affirm the judgment of the circuit court. The logic of its ruling in my view cannot be refuted. The opinion of the learned judge is hereby quoted in full as it lucidly presents the basis of my dissent.

"This court has no hesitancy in reversing the Commission in this case because the material facts are undisputed. Compensation thus resolves itself into a question of fact. Orvis Noel Rogers was a tractor driver of Gilbert R. McCollum, a lumber mill owner and logger, whose woods crew at the time of Rogers' death was engaged in cutting a tract five miles north of Kingsland for McCollum's mill at Farindale. This tract was approximately twenty miles from the point on Highway 167 where McCollum's woods foreman picked up Rogers by prearrangement and invariable custom. The woods foreman, Jim Garlington, picked up two other employees at another point on Highway 167 about 4 miles from where Rogers was picked up. Garlington was in complete charge

of the woods crew and McCollum testified that whatever arrangements he made were 'satisfactory with him.'

"This arrangement had been in effect for about two months, significantly since work on the Kingsland tract had begun. In the Referee's opinion, adopted by the Commission, this arrangement was not considered to be an incident of the employment, but merely as an 'arrangement between fellow employees'. Such a view completely overlooks the fact that Garlington was in complete charge of the woods operations for Mr. Collum. Garlington was more than a fellow employee. He had the sole responsibility for the operation on which the deceased was employed. In all the arrangements he made and all that he did in carrying out these arrangements he was McCollum's *alter ego*. No other conclusion can be drawn from the evidence in this case.

"There is another factor that is equally persuasive in my finding that the transportation provided by Garlington was company-furnished transportation and thus an incident of the employment. Rogers lived a considerable distance from the Kingsland tract. On a salary of $50 per week it is inconceivable that he would have been expected to furnish his own transportation, into the log woods. To have expected Rogers to drive his automobile 35 or 40 miles a day and support a family of seven on a salary of $50 per week is hardly likely. Mr. Garlington would have had great difficulty in maintaining a woods crew under such an arrangement. Quite obviously the monetary benefit of free transportation by his foreman into the distant log woods was an important consideration in the employment relationship. (See *Ward* v. *Cardillo,* 135 F. 2d 260 (D. C. 1943) *infra*.) It cannot be dismissed as 'an arrangement made between fellow employees of the respondent, and . . . not imputable to the respondent.'

"The arrangement for picking up Mr. Rogers was quite specific. He was to be at the point where the county road on which he lived intersected Highway 167 at 6:30 A.M. He was to remain at this location until 7:00 A.M.

If Garlington had not arrived by then, it could be assumed that he had decided not to work the crew because of weather conditions and Rogers could return home. There is a small clearing at the intersection and Rogers always waited there for Garlington. The various witnesses estimated this clearing to be from two-fifths to three-fourths of a mile from Rogers' home.

"On Monday, January 14, the day before Rogers' death, the crew worked only part of the day because of the cold. Mr. McCollum saw Rogers in Farindale at about 5:00 P.M. Rogers was specifically told that part of the crew would work the next day and that he could work. According to his wife, Rogers understood from McCollum that he was supposed to work the next day, regardless of the cold, for he told her when they discussed the exceptional cold (8 degrees), 'But he told me to be there and I've got to go.'

"Obviously McCollum did not tell his foreman, Garlington, that Rogers had been instructed to work the next day. Garlington got up around 5:30 A.M., went outside and decided it was too cold to work. Rogers had no 'phone and this decision was not communicated to him.

"Rogers got up between 5:00 and 5:30 and left home a few minutes after 6:00 A.M. A neighbor followed his car out to the clearing at the intersection and another neighbor at 6:20 or 6:25 A.M. saw his car in the clearing with the motor running. Since his standing instructions were to remain at this point until 7:00 A.M., it must be assumed that he remained in the clearing, waiting for Garlington, until this time or shortly thereafter. He then started back to his home from the clearing. As stated above, this distance was estimated as between two-fifths and three-quarters of a mile. When he reached the turn-off from the county road to his home, he lapsed into unconsciousness. His car nosed off of the road into some little bushes. According to the undertaker the front end of the car was completely off the road as if he didn't turn far enough to the right. At about 8:15 or 8:30 A.M. the rural mail carrier found Rogers' lifeless body in the

automobile. The motor was still running. While he went to notify Mrs. Rogers, the car ran out of gasoline and the motor stopped. Mrs. Woodrow Burford, a close neighbor of the Rogers, who lives to the left of the road leading to Rogers' home, heard and saw the Rogers car at the location where the mail carrier found it. It had its lights on and periodically the motor raced. She could not fix the time when the car reached this location except to say that it was between 6:30 and 7:30 A.M.

"The undertaker testified that Rogers' skin had the reddish tint and his blood the bright red color that is characteristic of carbon monoxide poisoning. The referee's finding, adopted by the Commission, was that death occurred from this cause. Carbon monoxide poisoning is so common and has been so widely studied that we may take judicial knowledge of the mechanism by which it produces death in the human body. The gas is tasteless, colorless and odorless and is formed by burning carbon fuels in a deficiency of air or oxygen. The gas forms a relatively stable compound with haemoglobin, the part of the blood which carries oxygen from the lungs. The formation of this compound called carbonic oxide haemoglobin prevents the haemoglobin from carrying oxygen and asphyxiation results. Of course, it takes some time for this process to reach fruition. Here it undoubtedly began at the clearing where Rogers was waiting for his foreman, because he would have driven the short distance from the point at the clearing to the point where he became unconscious in about a minute. It would have required a longer period to build the deadly compound to a critical point in his bloodstream. It is common knowledge that carbon monoxide concentration builds faster in a stationary car than in one which is moving because some air is forced into a moving car.

## "CONCLUSIONS OF LAW

"The first legal question to be decided is whether the arrangement between the foreman Garlington and Rogers constituted company-furnished transportation. The referee and the Commission held that it did not and

such holding formed the principal basis for a denial of compensation to the widow and five children. The holding however, overlooks such cases as *Hunter* v. *Summerville,* 205 Ark. 463, 169 S. W. 2d 579 (1943), and *Blankenship Logging Co.* v. *Brown,* 212 Ark. 871, 208 S. W. 2d 772 (1948), where compensation was awarded under similar circumstances. In the former case the claimant was a timber cutter who received injuries while riding home from work in a truck. The employee lived about fifteen miles from where the work was being carried on, and at the hearing the employer when asked about the arrangement with his men as to transportation to and from work said: 'We had trucks going out there and if they wanted to ride, they could.' This is quite similar to McCollum's testimony in the instant case. There are two other significant similarities to *Hunter* v. *Summerville.* In the latter case the truck *was owned by a sub-contractor working on the same job.* Secondly, the custom was for the employees to furnish their own transportation to a certain filling station where they would be picked up.

"In the *Blankenship* case the employer actually owned the vehicle in question, but it was being driven on the day of the death of the claimant's decedent by an allegedly unauthorized employee. The court pointed out that for the exception to be applicable to the transportation arrangement need not be rigid nor clearly defined. It is only necessary that the transportation be furnished in some manner by the employer 'for the mutual benefit of himself and the workmen of facilitate the progress of the work.' The court at 212 Ark. 875-76 quoted:

'This exception to the rule may arise either as the result of custom or contract, express or implied. It may be implied from the nature and circumstances of the employment and the custom of the employer to furnish transportation . . .'
" 'There are no rigid legal principles to guide the Deputy Commissioner in determining whether the employer contracted to and did furnish transportation to and from work. "No exact formula can be laid down which will automatically solve every case." (Citing cases.) Each

employment relationship must be pursued to discover whether the employer, by express agreement or by a course of dealing, contracted to and did furnish this type of transportation. . . .'

"Respondents cite the case of *Dickinson* v. *Central Construction Co.*, 233 Ark. 360, 344 S. W. 2d 599 (1961), a 4-3 decision affirming a denial of compensation by the Commission, where two employees were injured while being transported by their foreman to work from Camden to Pine Bluff. But this case may be easily distinguished. Sales, the foreman, while working in Pine Bluff on some construction jobs, had an apartment there, although his home was at Camden. The claimants also lived at Camden but ordinarily drove their own trucks to the job sites at Pine Bluff. Sales went home to Camden for Thanksgiving. Before leaving Pine Bluff on Wednesday he had not delivered checks to some of his employees and it was necessary for him to return the day after Thanksgiving to perform this duty. Since he had to go from Camden to Pine Bluff he invited claimants to leave their cars and ride with him. Thus, we had an isolated instance of transportation purely for the convenience of the claimants in which their employer had no interest and to which no approval had been given, express or implied, by contract or by custom.

"On the other hand, the transportation in the instant case was regular, daily transportation at an appointed time. It was by virtue of an arrangement made by the employer's woods foreman when the employer began cutting a tract at a considerable distance from Rogers' home. It had been in effect for two months, with the employer's knowledge and acquisence.

"This court has no doubt but that the Supreme Court would have reached a different result in the *Dickinson* case if Sales, the foreman, had by prearrangement transported the claimants each day from Camden to Pine Bluff with the tacit approval of the employer, instead of on one isolated occasion for their own convenience. In other words, this case pointed up the testimony of the

claimants 'that it had not been the custom of practice for the employer to furnish the transportation.' 233 Ark. at 362. Therefore, the case at bar is factually akin to *Hunter* v. *Summerville* and *Blankenship Logging Co.* v. *Brown, supra,* rather than to *Dickinson* v. *Central Construction Co.* The former cases are binding on the first issue presented—whether the transportation was company-furnished. It follows then that the Commission erred, as a matter of law, in finding that the transportation was only 'an arrangement between fellow employees.'

"The second issue, only touched in passing by the referee and Commission, presents the major difficulty to this court. Even though the transportation here was company-furnished, did Rogers' death come within the ambit of that transportation? Virtually all jurisdictions recognize that company-furnished transportation constitutes an exception to the 'going and coming' rule. However, many jurisdictions hold that coverage does not begin until the claimant actually enters the company vehicle. Arkansas, however, is in the vanguard of those jurisdictions applying a more liberal rule. *Simply stated,* the liberal rule is that when the employer furnishes the transportation, all the incidents related to meeting, boarding, waiting for, and leaving the employer's conveyance become compensation-covered incidents of the employment.

"Larson's textbook, the leading work on workman's compensation, builds its discussion of the liberal rule around the landmark Arkansas case, *Owens* v. *Southeast Arkansas Transportation Co.,* 216 Ark. 950, 228 S. W. 2d 646 (1950). Larson says in Section 1740 of Workmen's Compensation Law:

"The case which appears to have extended protection the furtherest involved a bus driver who had finished his day's work, and, pursuant to his privilege of riding home without charge on his employer's busses, had dashed diagonally across a city street to catch a bus that was about to leave. He was struck by a motorist,

and his death was held compensable. The court put it this way:

" 'In effect the Company said to Owens, ''Take your pass and go across the street to our bus; your day's work has been finished, and we are interested in seeing that you get home as expeditiously as possible.' "

"Larson then cites several cases as being in accord with the Arkansas holding. One of these, *Flanagan* v. *Webster*, 107 Conn. 502, 142 A. 201 (1928), is almost on all fours with this case. The facts given in the opinion are as follows:

"The commissioner made an award of compensation to the plaintiff claimant, from which defendants appealed. The superior court reversed the case upon the finding of the commissioner for the advice of this court. On December 23, 1926, the plaintiff was and had been for less than two weeks prior to this date in the employ of the defendant employer and at work upon the state highway in the town of Chesire. The plaintiff lived in the village of West Chesire. The only way in which he could reach his work was through transportation furnished by the defendant employer in one of its trucks which stopped for him in the morning usually at a point on the state road and carried him to his place of work. It ordinarily came along in time to get the men to their work at 6:30 a.m. On the slated morning the plaintiff left his home and walked to the state road where the truck usually picked him up. It was late on this morning; the weather was cold and because of this the plaintiff walked along the road in order to keep warm and upon its left side. The truck came up with him, and stopped on the right-hand side of the road for him to board it. While plaintiff was crossing the highway to board the standing truck, he was struck by an automobile and sustained a fracture of the femur. The commissioner held upon these facts that the plaintiff when injured was doing something incidental to his employment, and that the injury arose out of and in the course of his employment. The defendants claimed that, as the plaintiff had not actually boarded the truck, he was not on premises controlled by the em-

ployer, and consequently, the injury did not arise out of and in the course of his employment.''

The court's language, in granting compensation, is highly appropriate to the case at bar:

''Thus the employer might designate the place where the automobile was to be boarded; it might be on private property or on a public highway. If the employee went to the designated place within a reasonable time prior to the time when he was to board the automobile, he would, from the time he reached the designated place, be then carrying out the direction of his employer, and that direction would become an incident of the employment and a part of the means of transportation, just as a railway station, or a bus waiting room, is a necessary incident of the railway or busline. Similarly, when an employee is directed to report each morning at a given place, or to a certain person, to receive instruction as to where he is required to work that day, the relation of master and servant has been held to commence at the time he reported, and his employment to have begun at that time, and that the injury there after occurring, prior to the time of actually beginning work, was suffered in the course of his employment. Milwaukee v. Althoff, 156 Wis. 68, 145 N. W. 238, L.R.A. 1916A, 327; Milwaukee v. Industrial Com., 185 Wis. 311, 201 N. W. 240. So it has been held that the fact that the injury occurs while the employee was in the act of boarding the train and not while being transported does not relieve the employer of liability for compensation. Fisher v. Tidewater Building Co., 96 N. J. Law 103, 114 A. 150. Nor does it relieve the employer where the employee is injured when upon his employer's premises and engaged in the preparation necessary for beginning the work of his employment. . . .

''If the plaintiff had, when he walked from his home to the state road where his employer's truck usually picked him up, remained at this point, and was there injured while waiting for the truck, there could be no doubt that during the period plaintiff was waiting at this point he was in the course of his employment. His being

at this point, upon this finding, would have been an incident of his employment, and a fulfillment of the implied direction of his employer. Under the authorities we have cited the employee would be held to have been in the course of his employment.

"Here decedent's injury began at the designated spot where he was to await company-furnished transportation. Rogers reached this point at about 6:10 A.M. The weather was extremely cold (8-10 degrees). We know his motor was running at 6:25 A.M. We know it was still running about 8:15 A.M. when he was found dead in his automobile. He had started home from the clearing where he was supposed to wait until 7:00 A.M. and had lost consciousness as he started to turn into the driveway to his home, two-fifths to three-fourths of a mile from the clearing. Though the insidious effect of the carbon monoxide rendered him unconscious, a minute or so after he left the clearing, we know that the deadly gas had begun to be absorbed into his blood stream while he was waiting at the spot designated by his foreman where he was to receive company-furnished transportation. So, the injury began while he was at this location. In this respect this case is no different from one of the other cases cited by Larson in Section 1740 as being in accord with *Owens* v. *Southeast Arkansas Transportation Co.,* *supra.*

"In that case, *Radermacher* v. *St. Paul City Ry. Co.,* 8 N. W. 2d 466 (Minn. 1943), claimant, a car cleaner, had a ticket book entitling him to ride free on his employer's streetcars. While he was waiting for a streetcar in a 'safety isle', he was struck by a 'hit and run' driver. The injury was held to be compensable.

"Assume that while Rogers was waiting in the clearing, a 'hit and run' driver ran off the road, struck his car and killed. This would be exactly the *Radermacher* case. There is no difference in Rogers' being killed by a 'hit and run' driver and being asphyxiated by carbon monoxide, the deadly effects of which began when Rogers was parked at this location. Nor is the legal import

changed, if Rogers had been hit by a 'hit and run' driver and badly injured, but in order to get help, walked back down the road toward his home and collapsed and died before reaching there.

"Other cases awarding compensation in similar fact situations are: *Sibler* v. *Lincoln-Alliance Bank & Trust Co.*, 280 N. Y. 173, 19 N. E. 2d 1008 (1939), (claimant injured crossing street to home where foreman had taken him after late work); *Ward* v. *Cardillo*, 135 F. 2d 260 (D. C. 1943) (claimant injured crossing street to board company truck which picked him up morning at 7:00 A.M.; *free transportation found to be a part of compensation, since it saved claimant $5 per day in transportation costs*); *Povia Bros. Farms* v. *Valez*, 74 So. 2d 103 (1954) (claimant injured crossing road to board company truck, which picked up employees in neighborhood each morning as driver saw them, no particular assembly point being designated).

"Cases involving compensable deaths from carbon monoxide are: *Mascika* v. *Connecticut Tool Engineering Co.*, 147 Atl. 11 (Conn., 1929) (decedent asphyxiated in own car preparing to go on trip to collect bills); *Derleth* v. *Roach & Seeber Co.*, 227 Mich. 258, 198 N. W. 948 (1924) (decedent, a traveling salesman, fearing batteries would freeze in very cold weather, went home to test them in own garage, where he was asphyxiated); *Leilich* v. *Chevrolet Motor Co.*, 328 Mo. 112, 40 S. W. 2d 601 (1931) (traveling salesman asphyxiated while changing tire in home).

"Mention might also be made of the *State Employees' Retirement System* v. *Industrial Commission*, 97 Cal. App. 2d 380, 217 P. 2d 922 (1950). A game warden, who sometimes slept in his car while on night patrol, was found dead of carbon monoxide on a secluded side road. The interior of the car had been made into a bed and at the decedent's side was the nude body of a female (not his wife). The California court affirmed an award of compensation. If California can grant compensation under these circumstances to one of its citizens, surely

compensation is justified in Arkansas by reason and justice, in the case at bar. More, instead of being overcome while at an assignation, Rogers was overcome when he went, under an express work order from his employer, to a point where he was customarily picked up by his foreman. The foreman was not told by the employer that Rogers was to work and because of the extreme cold (8-10 degrees) decided not to pick up the crew. This decision was not communicated to Rogers and he was asphyxiated by carbon monoxide, while vainly waiting for his foreman in the extreme cold.

"In view of this court there is more work-connection with the death here than in *Owens* v. *Southeast Arkansas Transportation Co., supra,* and the other cases discussed *supra.* The usual transportation afforded Rogers was an incident of the employment, but because of the events surrounding Rogers' presence at the clearing on this particular morning, the failure to provide transportation was even more of an incident of the employment."

For the reasons stated, I respectfully dissent.

ED. F. McFADDIN, Associate Justice, (concurring). I concur in the reversal of the Circuit Court and the affirmance of the action of the Workmen's Compensation Commission in disallowing compensation. The Majority Opinion contains this paragraph:

"Counsel for the appellees contend that Garlington was acting for his employer in driving Rogers to and from work. From this premise it is argued that Rogers was also in the course of his employment while waiting in his own car beside the highway and that the onset of his asphyxiation must have taken place before he started to return to his home. We find it unnecessary to test this chain of reasoning, for there is substantial evidence to support the Commission's finding that Rogers' transportation was not being furnished by his employer."

I agree with the Majority that Mr. Rogers' transportation was not being furnished by his employer; but

there are other—and to me equally cogent—reasons why Mr. Rogers was not covered by the Workmen's Compensation Act at the time of his death.

In the first place, he had left the pick-up point and started home. Some time after 7:00 A.M. Mr. Rogers apparently realized that Mr. Garlington was not coming for him, so Mr. Rogers started back to his home. He drove down the county road about three-fourths of a mile and stopped. He was found dead in his car about 8:15. When Mr. Rogers left the pick-up point on the highway and started home in his own vehicle he ceased any semblance of coverage under the Workmen's Compensation Act, and for that reason I think the Commission was correct in denying compensation.

Another and equally cogent reason for denying compensation is the fact that there is no evidence that Mr. Rogers received the "lethal dose" of carbon monoxide while he was on the highway waiting for Garlington to arrive. Speculation cannot take the place of proof. Mr. Rogers was in possession of sufficient faculties to turn his car around and drive toward home; and we cannot speculate as to when Mr. Rogers received the lethal dose of carbon monoxide.