

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-16-12

| | |
|---|---|
| | **Opinion Delivered** June 8, 2016 |
| WAYNE HOLDEN & COMPANY, INC. | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION |
| APPELLANT | [NO. G400368] |
| V. | |
| TYLER WAGGONER (DECEASED) | REVERSED AND DISMISSED |
| APPELLEE | |

## BRANDON J. HARRISON, Judge

Tyler Waggoner died in a motor-vehicle collision carpooling home from work in 2013. The Arkansas Workers' Compensation Commission (Commission) held that Waggoner sustained a compensable injury while performing employment services and awarded benefits to his minor child. His employer, Wayne Holden & Company, Inc., (Holden) appeals the Commission's decision. We reverse the Commission's decision and dismiss the case because substantial evidence does not support the conclusion that Waggoner was advancing his employer's interests when he was fatally injured.

### I. *Facts*

The material facts in this case are largely undisputed. Waggoner, a resident of Texarkana, Texas, worked as a crew leader for Holden; his job was to lay new or replacement gas lines. Holden's main offices are located in Texarkana, Arkansas. But Holden performs work on natural-gas pipelines for different companies across numerous

cities and states, including Shreveport, Louisiana. The parties do not dispute that Waggoner was assigned to work primarily in and around Shreveport, Louisiana.

On 26 November 2013, Waggoner clocked in at his usual time of 7:00 a.m. at the company office in Shreveport. He then left with his crew in a company truck to do work replacing or laying new gas lines for one of Holden's clients, Centerpoint Energy. That work stopped early in the day because of rain. Waggoner and his crew returned to the Shreveport company office and clocked out around 11:00 a.m. After clocking out, Waggoner left the Shreveport office with two co-workers in a vehicle driven by another co-worker, Kendrick Blackmon. A distracted driver rear-ended Blackmon's vehicle at a new stoplight on Highway 71 around 12:23 p.m. in Caddo Parrish, Louisiana, killing Waggoner. Testimony during the administrative hearing revealed that it took around twenty-five or thirty minutes to reach Caddo Parrish from the company office in Shreveport, and about an hour or hour and a half to reach Texarkana using Highway 71. The vehicle in which Waggoner was riding was Blackmon's personal vehicle, not a company-owned truck.

Witness testimony given during the administrative hearing about a $50 per diem Holden's Texarkana-based employees received is critical to the Commission's decision and our review of it.

### A. Kara Warren's Testimony

Waggoner's partner, Kara Warren, testified that when his employment with Holden began in 2011, Waggoner rode to work in Shreveport in a company van. During that time he was not paid a per diem amount. Starting sometime in 2012, Holden changed its policy

and discontinued using a company vehicle to transport employees from Texarkana to Shreveport. Warren explained that when the Texarkana-based employees started to drive their own vehicles,

> [m]ost of the time, they got together and week by week, they'd use somebody's car. They'd give that person ten or fifteen dollars a day for gas, and they'd get together and drive to Shreveport and drive back.

Warren also said that when Waggoner worked in Shreveport, he returned to Texarkana each night and received a $50 per diem. And when Waggoner worked in Mena, Arkansas, he chose to spend the night instead of driving back and forth and received close to $75 per diem per day because Mena was farther from Texarkana, according to Warren. On cross-examination, Warren agreed that Waggoner did not have to turn in receipts or anything else showing how he spent the per diem money.

## B. Wasey Kyle Davis's Testimony

Wasey Kyle Davis, a Holden superintendent, confirmed that Waggoner "worked consistently" at the Shreveport site. When questioned about the policy change, Davis explained that the company decided that it would rather pay per diem than transport employees in a van because people would not arrive to the van on time. Davis said that employees were never compensated for time riding in the van. According to Davis, the per diem was "motel money." When Davis worked out of town in Oklahoma, he and three others would use the money to get a motel room rather than commute from Texarkana. Davis testified that he drives a company truck and has a company credit card he uses to buy fuel, and he still receives a per diem. Davis also explained the per diem this way:

> It don't matter what they [Holden's employees] do with it. I mean, they can go spend it on lunch, they can spend it on supper, they can take their family out to eat, just whatever.

Waggoner was not subject to being on call while he was traveling to and from work, according to Davis. Waggoner did not receive a per diem for the days he did not work or when he worked in Texarkana.

### C. Quintin Helms's Testimony

Quintin Helms was a fellow passenger in Blackmon's vehicle the day the accident happened. Helms testified that after they signed out around 11:00 a.m. that day, they went by a convenience store before heading home to Texarkana. Helms agreed that he was not "on the job" at the time of the accident and was not being paid for his time when the accident occurred. According to Helms, he and his co-workers would carpool, and Holden would "pay us per diem for driving." This colloquy occurred during cross-examination:

HOLDEN'S ATTORNEY: As you understood it, why were they giving you a per diem?

HELMS: For food and gas.

HOLDEN'S ATTORNEY: Hotel expense if you needed it?

HELMS: Yes, sir. That's what it was meant for.

HOLDEN'S ATTORNEY: So, how would you typically use your per diem?

HELMS: Gas or bills or whatever I needed it for.

HOLDEN'S ATTORNEY: You could use it for anything, right?

HELMS: Yes, sir.

On redirect examination, Helms explained that it cost him "a lot less than $50.00 a day in gas money" when carpooling. He thought he contributed about $10 toward gas

SLIP OPINION

expenses when he carpooled. When Helms worked in Shreveport, he would carpool with employees on their way from Texarkana because he lived in Fouke, Arkansas, which was a little closer to Shreveport than Texarkana.

### D. Michael Millsap's Testimony

Michael Millsap, an office assistant/engineer for Holden, also testified at the administrative hearing. Millsap explained that he lives in Fouke, Arkansas and that he commutes to Shreveport every day for work. Millsap's understanding was that no restrictions existed on his $50 a day per diem and that he did not have to turn in any documentation of what he used the money for. He agreed that the $50 was not "treated any way differently . . . than the rest of [his] wages." On cross-examination, Millsap said that the per diem is

> basically, a company convenience to offset for people having to work out of town in case they want to stay overnight and they need to get a hotel to stay overnight. It can be spent however they want. If they want to use it to buy their meals to go out to eat, you know, at lunch time or whatever.

### E. Kendrick Blackmon's Testimony

Kendrick Blackmon's (the driver) deposition testimony was admitted as evidence during the administrative hearing. Blackmon testified that the "whole purpose" of a per diem was to "give you a choice."

> You know, we're going to give you $50.00 a day, and you can either stay here or you can go there, but, you know, this is what we're going to pay you for working up here, and the further you worked, the further out you worked, the more you were paid.

Blackmon then explained that he would make $75 per diem in Little Rock and $50 per diem in Shreveport.

5

According to Blackmon, Holden made no recommendation to its employees about whether they should stay in Shreveport or commute. Blackmon testified that after his daughter was born, he drove back and forth more often, but if he worked "extra late" he would sometimes get a motel room with a few guys because he was too tired to drive home. Blackmon agreed that Holden "didn't care how you got there as long as you were there at 7:00 [a.m.]."

> That's why they gave you the per diem. If you want to get a room, you've got the $50.00 If you want to drive back and forth, you've got gas money. That's what the per diem was for, to get you to work and get you wherever you're going so that you can rest and get back to work. . . . The $10 per hour pay did not start until you clock in at the Centerpoint office. If you clocked in that day, the per diem is automatic for that day.

Blackmon also confirmed that carpooling co-workers would "chip in for gas" and that they "did not have to keep track of receipts or turn in hotel or gas receipts or anything like that."

## II. *The Commission's Decision*

Based on the testimony received during the hearing, the administrative law judge (ALJ) decided that Waggoner was performing employment services when he was fatally injured and awarded benefits. The ALJ reviewed numerous appellate-court cases and administrative decisions and found that one or more exceptions to the going-and-coming rule applied. Holden appealed the ALJ's decision to the full Commission, and the Commission affirmed and adopted the ALJ's written findings as its own.

Here is the most important part of the decision on review:

> In light of the evidence that per diem was implemented because employees were not arriving at the same time to ride in the company vehicles, and the testimony that the various per diem rates varied depending on the distance of the work locale from Texarkana, I conclude that the per diem was intended to bear a rational relationship to the actual cost of the employee's

transportation costs from Texarkana to the company's various work sites. In addition, there appears to be no dispute in the present case that management was well aware that Texarkana residents were generally carpooling to and from Shreveport, rather than using their per diem to stay in Shreveport during the week, when the accident occurred.

In summary, the evidence establishes that Wayne Holden & Company is a Texarkana, Arkansas, based company that requires manpower to fulfill contract obligations at various sites in various States, including but not necessarily limited to towns in Arkansas, Texas and Louisiana. Wayne Holden & Company does not necessarily limit itself by hiring only local labor for local contract work. Wayne Holden & Company instead pays its employees per diem.

The per diem that Wayne Holden & Company pays to Texarkana based employees depends on their assigned work station—the further from Texarkana, the greater the per diem. The Texarkana employees working in Shreveport, Louisiana, are paid $50 per diem per day. While there was some evidence presented that the per diem was intended to pay for hotels, for the reasons discussed herein, this examiner is persuaded that the per diem for Texarkana employees working in Shreveport was both initiated to replace prior free daily travel between the towns in a company vehicle, and that the per diem rates were intended to bear a relationship to the actual cost of travel since the rates varied by distance from Texarkana.

Again, I note that with carpooling the Texarkana area employees working in Shreveport are able to limit their actual travel expense to approximately $10 each per day. This leaves approximately $40 per day of their $50 per day per diem available to compensate the carpooling employees for their travel time. By utilizing carpooling, I find that the $50 per day per diem that Wayne Holden & Company paid to Mr. Waggoner and similarly situated employees therefore in fact compensated Mr. Waggoner not only a substantial part of his travel expenses, but in fact, essentially compensated Mr. Waggoner his entire travel costs of approximately $10 per day with $40 per day left over to compensate Mr. Waggoner for his travel time.

Because I conclude under these circumstances that daily travel is an inherent function of the contract work engaged in by Wayne Holden & Company employees in Shreveport, and that Wayne Holden & Company adequately compensated its employees for the cost of that daily travel through per diem, I find that the claimant was at least indirectly benefitting his employer at the time of the 2014 motor vehicle accident that occurred on Highway 71.

To the extent that the respondents contend that the travelers engaged in a deviation since the accident occurred an hour and twenty-three minutes after the work ended, the evidence is conflicting as to whether or not the vehicle ever even stopped anywhere after leaving the Shreveport work site, or was instead simply slowed by the weather and by the same vehicle that later reared-ended Mr. Blackmon's vehicle at the stop light. In any event, there is no question that the accident occurred at the new Highway 71 stop light on the only route between Shreveport and Texarkana identified by the witnesses, and the Commission is expected to determine whether the employee was engaged in employment activities at the time the injury occurred. *See Hill v. LDA Leasing*, 2010 Ark. App. 271, 374, S.W.3d 268 (2010).

Again, in this case Mr. Blackmon's vehicle was stopped at a red stoplight on Highway 71 waiting for the light to turn green when the vehicle was rear-ended. Therefore, even if the preponderance of the evidence established some type of earlier deviation, which it does not, the undisputed evidence is that the vehicle was appropriately stopped in the highway on the direct route from Shreveport to Texarkana *when the accident occurred*. Since the accident clearly did not occur during any type of deviation, I find that the employees were in fact in the course and scope of their employment and performing employment services when the automobile accident occurred.

In reaching these conclusions, this examiner is aware of the prior findings of the Arkansas Supreme Court concluding that employee carpooling to a remote work site, without more, is not sufficient in itself to bring the travel within the course and scope of the employment. *See generally McCollum v. Rogers*, 238 Ark. 499, 382 S. W. 2d 892 (1964*); O'Meara v. Beasley*, 215 Ark. 655, 221 S.W.2d 282 (1949); *Cerrato v. McGeorge Contracting Co.*, 206 Ark. 1045, 178 S.W.2d 247 (1944). On the other hand, the Arkansas Supreme Court has had no reservation in finding such travel work related where the employer furnishes the vehicle for travel to the work site. *Blankenship Logging Co. v. Brown*, 212 Ark. 871; 208 S.W.2d 778 (1948) *Hunter v. Summerville*, 205 Ark. 463, 169 S.W.2d 579 (1943).

While this examiner can find no prior published Arkansas cases involving both carpooling and per diem in the same case, I note that a majority of the United States Supreme Court has previously on at least one occasion had no apparent reservation in finding an employer liable for an injury incurred during employee-arranged carpooling, without any actual employer control of the carpool vehicles used by the employees, under circumstances where (1) the employer paid the workers $2 per day as the approximate cost of daily transportation between the District of Columbia and Quantico Marine Base in lieu of the employer actually furnishing transportation vehicles, (2) the employees formed a car pool, (3) pool

members alternated in driving their vehicles and non–pool members paid $1 per day to participate, and (4) the employer was aware of the arrangement and acquiesced therein. *Cardillo v. Liberty Mutual Co.*, 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947).

. . . I find that Mr. Waggoner's injury and death arose out of and occurred in the course and scope of his employment at a time when employment services were being performed. There is no dispute that the physical injuries sustained in the accident caused his death. Since I conclude that Mr. Waggoner was performing employment services when the accident occurred, I find his injuries and resulting death compensable.

III. *Discussion*

We view the evidence and all reasonable inferences in the light most favorable to the Commission's decision and affirm it if it is supported by substantial evidence. *Hill v. LDA Leasing, Inc.*, 2010 Ark. App. 271, 374 S.W.3d 268. Substantial evidence exists if reasonable minds could reach the Commission's conclusion, and we will not reverse unless fair-minded persons could not have reached the same conclusion when considering the same facts. *Id.* We will reverse if the Commission's decision is based on an incorrect application of the law. *Id.* When the Commission, as it did here, affirms and adopts the ALJ's opinion, we consider both the ALJ's decision and the Commission's majority opinion. *Bio-Tech Pharmacal, Inc. v. Blouin*, 2010 Ark. App. 714, at 3, 379 S.W.3d 594, 597.

A compensable injury is one that arises out of, and in the course of, employment; but it does not include one that is inflicted on an employee when employment services are not being performed. *Razorback Concrete v. Perkins*, 2015 Ark. App. 368, at 2, 465 S.W.3d 15, 16. As a general rule, an employee traveling to and from the workplace is not within the course of his or her employment. *Olsten Kimberly Quality Care v. Pettey*, 328 Ark. 381, 944 S.W.2d 524 (1997). This "going and coming" rule ordinarily prevents an employee

SLIP OPINION

from recovering benefits for an injury sustained while the employee is going to or coming from his place of employment. *Id.* The rationale for the rule is that an employee is not within the course of employment while traveling to or from his job. *Id.* There are, however, several exceptions. *Id.* The potential exceptions at issue here are what we will call (1) the "traveling employee" exception, (2) the "furnishing transportation" exception, and (3) the "compensated travel" exception.

When the injury occurs outside of the time-and-space boundaries of employment, our supreme court has said that the critical determination to be made is whether the workers'-compensation claimant was directly or indirectly advancing the interests of the employer at the time of the injury. *Moncus v. Billingsley Logging & Am. Ins.* Co., 366 Ark. 383, 235 S.W.3d 877 (2006). So the "going and coming" rule is best viewed as an analytical tool to be used in making this determination; however, the "going and coming" rule yields to a fact-based "preeminent consideration": whether the claimant was directly or indirectly advancing the interests of the employer at the time of the injury. *Id*; *see also Razorback Concrete*, 2015 Ark. App. 368, at 2, 465 S.W.3d at 16.

Holden argues here that Waggoner was not performing employment services when he was fatally injured after clocking out from work, and the Commission's benefits award should be reversed consistent with the going-and-coming rule. We must therefore decide whether substantial evidence supports the Commission's decision that Waggoner was performing employment services when he died.

Recall that the Commission found that Waggoner was indirectly benefiting his employer when the accident occurred because "daily travel" was an "inherent function" of

SLIP OPINION

his work. The traveling-employee exception applies when the employee must travel from job site to job site, whether or not he or she is paid for that travel time. *Moncus*, 366 Ark. at 387, 235 S.W.3d at 881. The rationale behind this exception is that where the employee is required to travel from job site to job site, such travel is an integral part of the job itself, and the "journey itself is part of the employment service." *Id.* But employees who have fixed hours and places of work are generally not considered to be in the course of their employment while traveling to and from work. *See Farler v. City of Cabot*, 95 Ark. App. 121, 124, 234 S.W.3d 352, 355 (2006) (employee received no workers'-compensation benefits when injured in a traffic accident on the way to work; he was not "on call" at the time of the accident; he was not performing his job duties of checking wells or responding to customers; he was "merely driving to the water plant, which was his duty station, to begin the day's work").

Substantial evidence does not support the Commission's conclusion that travel was an "inherent" part of Waggoner's job. In this case, Waggoner was assigned to work at the Shreveport office. There was a fixed location for him to clock in and clock out of every day. From that fixed location in Shreveport he would travel to various job sites. On the day the accident occurred, Waggoner clocked in at 7:00 a.m. and clocked out at 11:00 a.m. Waggoner was not a traveling employee, whose jobs might require travel as part and parcel to the job. *Compare with Olsten Kimberly*, 328 Ark. at 383, 944 S.W.2d at 525 (nursing assistant who was required to travel to the patients' homes to provide nursing services and had no fixed place of employment) and *Moncus*, 366 Ark. at 387, 235 S.W.3d at 881 (loggers who would generally travel directly from their homes to the job site to begin work and had

11

"no fixed place of employment"). Had Waggoner been hurt after arriving to his work station in Shreveport, or while traveling from job site to job site in the company vehicle with his crew after clocking in, then this case might require a different result. *E.g.*, *Cont'l Constr. Co. v. Nabors*, 2015 Ark. App. 60, at 4, 454 S.W.3d 762, 766 (awarding benefits to an employee who was injured walking to a company trailer to clock in for the day and to receive his per diem).

The second exception the Commission appears to have relied on is the "furnishing transportation" exception. On that point, the decision states,

> [T]he per diem for Texarkana employees working in Shreveport was both intended to replace prior free daily travel between the towns in a company vehicle, and that the per diem rates were intended to bear a relationship to the actual cost of travel since the rates varied by distance from Texarkana.

The Commission relied on a United States Supreme Court case, *Cardillo v. Liberty Mutual Co.*, 330 U.S. 469 (1947), to support its decision because (1) Holden paid a per diem in lieu of "actually furnishing transportation vehicles," (2) its employees formed a carpool, (3) the employees contributed to the carpooling driver's expense, and (4) Holden was aware of the arrangement.

The furnishing-transportation exception applies where the employer—by an express or implied contract or by established custom—provides transportation to and from work for its employees. *Chicot Mem'l Hosp. v. Veazey*, 9 Ark. App. 18, 21, 652 S.W.2d 631, 632–33 (1983). The exception does not apply when the transportation is furnished solely as a gratuity; and transportation provided by an employer is likely not gratuitous if the employer gains the benefit. *See Swearengin v. Evergreen Lawns*, 85 Ark. App. 61, 65, 145 S.W.3d 830, 832 (2004). This exception is most often implicated when an employer provides an

employee a vehicle for his or her use. But even then, an appellate court will not speculate about any benefit an employer might have received by its employee driving a company vehicle. *Id.*

The Commission ruled that Holden provided transportation for Waggoner to and from work, but that finding is unmoored from the record. Though it appears Holden initially provided transportation by way of a company van, it rescinded the policy and now allows its employees to choose their preferred method of transportation. Waggoner was in a private vehicle, not a company-provided one. There was no evidence that Holden had a contractual obligation to provide transportation nor was there an established custom of providing actual transportation at the time the fatal injury occurred. The *Cardillo* case, on which the Commission relied, is distinguishable. In *Cardillo*, the employer had an agreement with the employees' union that required it to furnish transportation by paying transportation expenses; here there was no such contractual obligation.

The Commission also concluded that the $50 per diem Waggoner received was to compensate him for traveling from Texarkana to Shreveport. It reasoned that $10 of the $50 per diem was intended to pay for his "actual travel expense" and the remaining $40 was to "compensate the employees for their travel time." The Commission also noted that "the per diem was intended to bear a rational relationship to the actual cost of the employee's transportation costs from Texarkana to the company's various work sites."

The "compensated travel" concept has not been fully developed or discussed in the case law. As a general rule, however, this exception applies when an employee's compensation covers the time going back and forth from work or an allowance is made for

the cost of transportation. *Chicot Mem'l Hosp.* 9 Ark. App. at 20, 652 S.W.2d at 632 (holding where the employer supplies less than the actual expense of travel, exception would apply only if the reimbursement bore a reasonable relation to the actual expense of travel or was for a substantial part of it). The compensated-travel exception has also been stated this way: "when the employer compensates the employee for his time from the moment he leaves home until he returns home." *Swearengin*, 85 Ark. App. at 65, 145 S.W.3d at 832.

Substantial evidence does not support the Commission's conclusion that Waggoner was reimbursed for his travel expense or was paid for his time traveling from Texarkana to Shreveport. Quintin Helms testified that he usually contributed about $10 of his $50 toward gas money and Kendrick Blackmon confirmed that the carpoolers would "chip in" for gas. But the undisputed testimony of every witness, including Helms and Blackmon, was that Holden employees were free to use, and in fact did use, the per diem money for anything they wanted—like motels, meals, and household bills. The employees did not have to account for their use of the $50, not to anyone. There was no testimony in the record to support the Commission's conclusion that $40 of the $50 per diem was to compensate employees specifically for their travel time. Employees would, from time to time, choose not to commute and instead use the money to stay in motels. They could choose to drive individually to work or carpool. No facts reasonably connect the $50 per diem to Waggoner's actual time or cost of commuting. Nor can it be reasonably inferred from the testimony, because the undisputed testimony of every witness was that the per diem money could be spent however each employee individually saw fit.

IV.  *Conclusion*

We reverse the Commission's award of benefits because there is no substantial evidence that Waggoner was directly or indirectly advancing his employer's interest when he was fatally injured.  He was not performing a special work-related task when the accident occurred.  Nor had Holden explicitly or implicitly agreed to furnish transportation for Waggoner or agreed that travel to and from work was part of the employment services it had hired Waggoner to perform.  His commute, however he chose to accomplish it (like carpooling), was not done within the course of employment for purposes of workers'-compensation law.  Waggoner was no longer advancing his employer's interests once he had finished work, clocked out, and left his fixed place of employment to go home.

We must therefore reverse the Commission's award and dismiss the claim.

Reversed and dismissed.

WHITEAKER and BROWN, JJ., agree.

*Barber Law Firm, PLLC*, by:  *Gail Ponders Gaines*, for appellant.

*Moore, Giles & Matteson, L.L.P.*, by:  *Greg Giles*, for appellee.