Cite as 2021 Ark. App. 257

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CV-20-577

| | |
|---|---|
| JUAN LOPEZ<br><br>APPELLANT<br><br>V.<br><br>JAMES DIVITO RACING STABLE AND MEADOWBROOK INSURANCE GROUP<br><br>APPELLEES | **Opinion Delivered** May 26, 2021<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION<br>[NO. G807384]<br><br><br>AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

Juan Lopez leaped out of a second-story window to escape a fire while off duty and sleeping in a space above some racing stables. Lopez fractured his spine on the landing. He sought medical treatment and temporary total-disability benefits. The administrative law judge found that Lopez proved by preponderance of the evidence that he sustained a compensable injury because, at the time of his injury, he was providing employment services to James Divito Racing Stable. The Arkansas Workers' Compensation Commission reversed the ALJ's decision, holding that Lopez was not providing such services when he was injured. Lopez appealed.

I.

Lopez has worked in the horse-racing industry for eighteen years. In February 2018, Divito hired Lopez as "hot walker." A hot walker is one who walks horses after a training session or a race to cool them down. Lopez worked for Divito from 5:30 a.m. to 10:30

a.m. each morning. In addition to these regular hours, Lopez worked when Divito had horses running in races, which happened about twenty-five times during the four-month racing season at Oaklawn. Lopez claimed that he was "on call" if his employer needed "something at any time." Divito disagreed with that assessment and said that Lopez did not have any "on call" duties outside of the race times or his regular morning work hours. According to Divito, Lopez did not work in the afternoons unless a horse from his stable raced and "[u]nless [Lopez's] number comes up."

The pay was $350 a week. Lopez said that he normally lived at the track during his career, which included a previous job he had with Divito at Churchill Downs in Kentucky. Divito testified that it was common in the horse-racing industry for the racetrack to provide housing for "the help" because "they can't afford to stay other places and—you know, it's easier for them to stay there and they can't afford to stay other places. It's too expensive." According to Divito, "There's no requirement for my stable help to stay at the racetrack. If they want to live somewhere else, that's fine." Divito did not pay Oaklawn for stabling his horse; Divito did not pay for the rooms above the stables that were available for his employees, either. Lopez said that he chose to live at the stables because the trainer provided it to him for free, because he could not afford to live anywhere else, and because "we have to be there or they will call us [to come work.]" During his deposition, Lopez agreed that he was not required to live "on Oaklawn"; he also said that Divito did not pay enough for him to afford an apartment in Hot Springs.

The night before his injury, Lopez went out to eat with a friend, came back to his room, and fell asleep around 11:30 p.m. Lopez testified that the trainer had told him to start work at 6:00 a.m. the next morning. He awoke Tuesday morning to a fire and the

2

smell of smoke; he said that the fire started at 5:45 a.m. Lopez tried to open the door to his room but could not because of the fire. So he jumped out of a second-story window above the stables, which was approximately ten feet to the ground. Lopez agreed that he was not doing anything work-related on the night of the injury.

Lopez thankfully escaped the fire. But he unfortunately suffered a burst fracture of his T12 vertebra in the escape and was transported to a hospital by ambulance. He underwent a successful short segment fixation and fusion surgery and stayed in the hospital four days. Lopez could not work for more than ten months as a result of his serious injury. Since then, Lopez said that he has tried working but cannot. He also said that he still experiences a lot of pain and numbness, so he has been unable to hold a job. He explained that his back "couldn't take" handling agitated racehorses after the injury.

II.

James Divito Racing Stable and its insurance carrier, Meadowbrook Insurance Group, contested Lopez's request for workers'-compensation benefits, asserting that he was not performing employment services at the time of his injury. The ALJ disagreed and found Lopez's injury compensable. Specifically, the ALJ found that Lopez's employer benefited from Lopez's "mere presence on the premises" given that Lopez needed to be on the racetrack grounds to walk the horses when his number was called and because Lopez was required to walk the horses after a race and during his regular working hours. Considering these employment activities, the ALJ was persuaded that Lopez's living on premises was inherently necessary for the performance of his employment duties as a hot walker. Lopez's room, in fact, was just above the stables where the horses were housed. Lopez therefore was indirectly advancing his employer's interest while staying in the room above the stables.

3

The ALJ found that Lopez was performing employment services when the fire occurred pursuant to the risk doctrine described in *Deffenbaugh Industrial v. Angus*, 313 Ark. 100, 852 S.W.2d 804 (1993), and applied by the court in *Jivan v. Economy Inn & Suites*, 370 Ark. 414, 260 S.W.3d 281 (2007).

The Commission reversed the ALJ's decision. It concluded that Lopez was not providing employment services when he was injured. The Commission found that this case was unlike *Deffenbaugh* and *Jivan* because Lopez was not required to live on premises as a condition of his employment. Instead, the Commission found that he willfully chose to stay at Oaklawn because it was free and convenient. The Commission concluded that, because Lopez was doing nothing to further the interest of his employer at the time of the injury, he failed to prove by a preponderance of the evidence that the injury was compensable.

III.

This case turns on whether Lopez was performing employment services when he was injured. In reviewing decisions from the Commission, we view the evidence and all reasonable inferences therefrom in the light most favorable to the Commission's findings, and we affirm if substantial evidence supports the decision. *Ark. Methodist Hosp. v. Hampton*, 90 Ark. App. 288, 293, 205 S.W.3d 848, 852 (2005). Substantial evidence exists if reasonable minds could reach the same conclusion as the Commission. *Id.* Because substantial evidence supports the Commission's decision, we affirm.

A compensable injury does not include an "[i]njury which was inflicted upon the employee at a time when employment services were not being performed[.]" Ark. Code Ann. § 11-9-102(4)(B)(iii) (Supp. 2019). An employee is performing employment services

4

when he or she is doing something generally required by his or her employer. *White v. Ga.-Pac. Corp.*, 339 Ark. 474, 6 S.W.3d 98 (1999). Lopez was performing employment services if his injury occurred within the time and space boundaries of the employment when he was carrying out his employer's purposes or advancing its interests directly or indirectly. *See Wayne Holden & Co., Inc. v. Waggoner*, 2016 Ark. App. 309, 497 S.W.3d 210.

Our supreme court has maintained a relatively bright-line rule—when a worker is "on call" on premises night and day, his or her personal and incidental activities are within the course of employment. In *Deffenbaugh*, Angus, a manager of an oil-service company, was required to live on the employer's premises as a condition of his employment and was on call twenty-four hours a day, seven days a week. Angus's injury occurred when a tornado hit the mobile home he was living in on premises. His employer argued that Angus was not "in the course and scope" of his employment because he was not performing any job-related duties at the time he was injured—he was simply eating dinner—so his unfortunate "Act of God" injury did not meet the time, place, and circumstances requirements. *Deffenbaugh*, 313 Ark. at 103, 852 S.W.2d at 807. The supreme court rejected this argument and held that there was substantial evidence that Angus was injured during the course of his employment. The court stated that Angus's employer obviously benefited from the manager's accessibility to the plant and the security his presence provided and that Angus was waiting on a particular truck to arrive when the tornado struck. Because Angus was continuously on duty twenty-four hours a day, seven days a week and was required to live on premises as a condition of his employment, he qualified as a "resident employee." *Id*. The court held that, as a resident employee, the entire period of his presence on premises is

5

deemed included in the course of employment. *Id.* at 104, 852 S.W.2d at 807. The court awarded compensation to Angus, reasoning that he was providing employment services while eating dinner.

In *Jivan*, an assistant hotel manager lived at the hotel rent-free and died when a fire broke out in her hotel room. When the fatal injury occurred, Jivan, who was off duty preparing to go to a gym to exercise, was changing her clothes in the bathroom of the free hotel room provided by her employer. She was not able to escape the fire and died from smoke inhalation. The supreme court awarded benefits under an "increased-risk doctrine" reasoning that Jivan's duties, which required her to reside at the hotel and be available for work duties at all times, put her more at risk than someone who did not live on premises. So, although Jivan was off duty changing into gym clothes when she died, she was considered to be "on-call" to address any hotel-related issues, which was a reason she and her husband were provided a free room in the hotel. As a resident employee of the hotel, the condition of living at the hotel "intensified the risk of injury due to extraordinary natural causes." *Jivan*, 370 Ark. at 419, 260 S.W.3d at 286 (citing *Deffenbaugh*, 313 Ark. at 106, 852 S.W.2d at 808). By being available twenty-four hours a day, Jivan was indirectly advancing her employer's interests.

Most employees, however, are not "resident employees." But even for normal, fixed-hour workers who are nonresident employees, injuries occurring on premises can sometimes be compensable even when they occur outside of the fixed hours. For example, personal activities like eating lunch or using the restroom can be within the course of employment even when those activities take place outside of the paid working hours on the employer's premises. *See, e.g.*, *Texarkana Sch. Dist. v. Conner*, 373 Ark. 372, 284 S.W.3d

6

57 (2008); *Collins v. Excel Specialty Prods.*, 347 Ark. 811, 69 S.W.3d 14 (2002). Other injuries have been held to be compensable in situations in which the employee is required to return to the employer's premises to help if the need arises. *E.g., Ray v. Univ. of Ark.*, 66 Ark. App. 177, 990 S.W.2d 558 (1999).

Yet, our caselaw holds that an overnight injury suffered by a nonresident employee is not compensable when the employee is merely attending to his own personal needs. (As further detailed below, this is essentially where Lopez finds himself.) In *Cook v. ABF Freight Systems, Inc.*, 88 Ark. App. 86, 194 S.W.3d 794 (2004), a truck driver was not "on the clock" nor was he being paid when he stayed in a motel room provided by his employer. He was, however, "on call," and his employer had made the arrangements and paid for his hotel room. The injury occurred when the driver was in the motel during a mandated eight-hour overnight rest break. The driver stepped in a puddle of water, reached for the light switch, and suffered an electric shock. We affirmed the Commission's denial of benefits, reasoning that the driver was free to do as he pleased during the eight-hour break, that his routine of personal grooming was the same whether he was on the road or not, and that his use of the bathroom that night was not "inherently necessary" for the performance of employment services. *Id.* at 90, 194 S.W.3d at 797.

IV.

Lopez argues that the Commission failed to address the transient nature of the horse-racing industry and that resident employees are a common occurrence. He contends that his living at the racetrack was an indirect benefit to his employer because it allowed the stable to pay him lower wages; made it easier for experienced help like him to move from racetrack to racetrack; and by living at the stable he would be there if needed, for example

7

if "a fire broke out and horses got loose." Lopez argues that the fire in the stables was a neutral risk like the hotel fire in *Jivan,* so the Workers' Compensation Act "will cover those injuries, particularly those from extraordinary nature causes that resident employees sustain on their employers' premises." He also says that the conditions of his employment intensified his risk of injury just as in *Jivan* and that, but for sleeping in a room above the stable, he would not have been injured in the fire.

Divito contends that *Jivan* is distinguishable because Lopez's residency at the stable was not a condition of his employment, and the room was provided as a courtesy by Oaklawn. Divito contends that Lopez was not a resident employee and therefore the increased-risk doctrine does not apply. According to Divito, an employee's finances have never been "factored when considering whether one is a residential employee and [Lopez] fails to present any authority as to why it should be added to the analysis." Lopez responds that the Commission "completely disregarded [that] . . . it was financially impossible for [Lopez] to live anywhere else but the room provided by his employer at the racetrack."

Neither party cites any Arkansas cases involving an employee who was injured while residing on the employer's premises when the employee's residence on premises was *permitted* but not *required*. *Jivan* and *Deffenbaugh* are not controlling here because those decisions involved resident employees who lived on premises and were on call twenty-four hours a day, seven days a week. This case is different because Lopez generally had fixed hours of work and was not required to be "on call" 24-7. Again, Divito testified that Lopez was not required to live on the grounds as a condition of his employment, so substantial evidence supports the Commission's fact-based conclusion that Lopez was not a resident employee.

8

We therefore hold that there was a substantial basis for the denial of benefits. Lopez was not within the time and space boundaries of his employment when he was injured. He had returned from dinner, there was no race the next day, and his set work hours did not begin until later that morning. What Lopez was doing at the time of the injury—sleeping—was not inherently necessary for the performance of his job as a hot walker. He was merely attending to his own personal needs. Lopez was not indirectly advancing his employer's interest either. The fire apparently occurred at 5:45 a.m., which was before his work began. Lopez was free to do as he pleased and had no employment obligation of any kind as he slept in a room above the stables provided for his convenience. Lopez's back injury is most regrettable; but it is also not compensable under Arkansas law.

Affirmed.

VIRDEN and KLAPPENBACH, JJ., agree.

*Steven McNeely DBA Attorney at Law*, by: *Steven R. McNeely*, for appellant.

*Gill Ragon Owen, P.A.*, by: *Jason A. Lee*, for appellees.